**SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY and American Telephone and Telegraph Company, Plaintiffs,**

**v.**

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. C80–1033A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 30, 1982.

documents were generated "in the course of a criminal investigation."

Harry S. Baxter, George B. Haley, Charles M. Dalziel, Jr., Keith M. Wiener, Kilpatrick & Cody, William F. Schneider, Drury B. Thompson, Atlanta, Ga., for plaintiffs.

Robert W. Patrick, Karen Wildau, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for defendant.

## ORDER

FORRESTER, District Judge.

Plaintiff, Southern Bell Telephone and Telegraph Company,[1] (hereinafter "Southern Bell") filed this action alleging that defendant John Hancock Mutual Life Insurance Company (hereinafter "Hancock") breached a contract to issue to Southern Bell a Guaranteed Investment Contract (hereinafter "GIC") in the amount of $20 million at a return of 15.3% to be computed annually.

Southern Bell maintains that as administrator and sponsor of its Plan and as named fiduciary under it, it has been damaged in the amount of $3,692,772.06 plus interest. Defendant denies liability. Plaintiff, being a New York corporation with its principal office and place of business in Atlanta, defendant, being a Massachusetts corporation qualified to do business in Georgia, and the amount in controversy exceeding $10,000 exclusive of interest and costs, this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Before the court are cross motions for summary judgment on the issue of liability.[2] Oral argument was heard on this matter on September 30, 1982. The parties, having filed a joint statement of undisputed facts, have requested this court to determine

---

1. Southern Bell was until October 1, 1980, sponsor and administrator of, and a named fiduciary under, the Pension Plan of Southern Bell and as such was authorized by the Plan to designate trustees and managers under the Plan, to direct those trustees and managers to invest pension funds in certain types of investments, including GICs issued by insurance companies, and as a named fiduciary to hold such contracts in its own name. Effective October 1, 1980, American Telephone and Telegraph Company succeeded Southern Bell in that capacity. Joint Statement by Plaintiff and Defendant of Material Facts Not In Dispute, ¶ 1 (hereinafter referred to as "Joint Statement").

2. On September 8, 1981, the court denied the parties' cross motions for summary judgment and allowed the defendant additional time to complete the discovery. Subsequently, defendant moved the court to reconsider its order denying the cross motions for summary judgment or alternatively to amend the order to include a determination to permit immediate appeal pursuant to 28 U.S.C. § 1292(b). On November 18, 1981, the court granted the parties leave to renew their motions for summary judgment upon completion of the extended discovery period and directed the parties to file a stipulation of all facts as to which they contend there is no dispute. On March 23, 1982, the parties filed the Joint Statement.

whether a contract exists as a matter of law.

## I. FACTS AND ARGUMENTS PRESENTED.

Hancock, like many other insurance companies, markets an investment vehicle known as a guaranteed investment contract[3] to employee pension and profit sharing funds. Joint Statement, ¶ 2. Its duration, rate of return (net and gross), and possible annuity provisions vary from instrument to instrument.

On April 2 or 3, 1980, a Southern Bell official, Robert N. Dean,[4] called Richard P. Troy of John Hancock[5] and told Troy that Southern Bell was interested in a GIC with a maturity of five to ten years in an amount between $5 million to $15 million with a lump sum payout at the end of the term. Troy advised Dean that Hancock did not offer that particular form of GIC but agreed to call him back. *Id.* ¶ 21, 22.

On April 10, 1980, Hancock made the decision to market a limited block of GIC's at an appropriate gross interest rate of up to 15½%. That decision was communicated orally to Hancock sales personnel throughout the country on April 11, 1980.[6] On Friday, April 11, Troy called Dean and advised him of the form of GIC that Hancock was offering, which was a four/in/four/out type of contract[7] with a guaranteed gross return of 15½% and return payments of interest and principal to begin on the last day of the fourth year of the term. *Id.*, ¶ 23. Dean informed his superior, Walker,[8] of the form of the GIC available from Hancock, and Walker and Dean decided they would attempt to obtain a $20 million GIC from Hancock. *Id.*, ¶ 24.

Pursuant to Dean's request for "something in writing," Troy instructed Iain McAvoy[9] to prepare a letter to Southern Bell. Dean received that letter on Monday, April 14. *Id.*, ¶ 25.

McAvoy called Dean on April 11 and advised him that he was mailing him a letter dated April 11 and that there would be certain ground rules which included the requirement that Southern Bell provide Hancock with a writing to the effect that Southern Bell was definitely going ahead with the purchase of a GIC.[10] *Id.*, ¶ 26. An additional requirement of Hancock was that Southern Bell was to make its deposit

3. A GIC is a form of investment by which an investor can deposit a fixed sum of money with an insurance company for a specified term of years and receive a guaranteed return on the investment. Joint Statement, ¶ 3.

4. Robert N. Dean was the Assistant Vice President and Assistant Treasurer of Southern Bell. He reported directly to A. Max Walker, the Vice President and Treasurer of Southern Bell. *Id.*, ¶¶ 16, 17.

5. Richard P. Troy was Vice President of the Group Pension Sales Department of Hancock.

6. This decision was coupled with a general policy decision requiring that a prospective purchaser of a GIC provide Hancock with both an unconditional commitment to purchase and the cash necessary to consummate the purchase within a specific period of time. Hancock discovered that without unconditional written commitments and cash payments, prospective investors would often renege on their commitments if interest rates increased between the time the initial commitment had been made and the deposit of money was to have been received by Hancock. Neither this experience of Hancock nor the policy decision was transmitted in writing to Hancock regional sales offices until after the negotiations with Southern Bell. Joint Statement, ¶¶ 9, 11.

7. A GIC on a four/in/four/out basis with a lump sum deposit in the beginning is a standard product of Hancock at a given period in time. In general terms, such a contract is one in which the invested funds are held by the insurance company at interest for four years, and then the invested funds are paid out in installments over four years, with interest on the declining balance. *Id.*, ¶ 7.

8. *See, supra,* note 4.

9. Iain McAvoy was at all times material to this action employed by Hancock as Manager, Group Pension Sales for the southeastern region. He reports to Lemuel Mercer, Field Vice President, and Mercer reports to Troy. Joint Statement, ¶ 20.

10. The writing has been referred to by McAvoy in his deposition as a "written commitment" and a "commitment letter." It has been described by Dean in his deposition as a "written confirmation," a "written acceptance," and a "written confirmation of acceptance." *Id.*, ¶ 26.

for the purchase of the GIC on Friday, April 18, 1980.[11]

It was understood between Dean and McAvoy that on April 14, 1980, Southern Bell would send a letter to Hancock by Wednesday, April 16, and that the $20 million in Southern Bell pension funds would be deposited in Hancock's account in a Boston bank designated by Hancock on Friday, April 18. *Id.*, ¶ 38. On Monday, April 14, Dean prepared and, with concurrence of counsel, sent to Hancock a letter which was received by Hancock on April 15, 1980. *Id.*, ¶ 35. The entire body of the letter reads as follows:

> It is our intent, *subject to review of the contract by our Legal Counsel,* to deposit $20 million in good funds on Friday, April 18, 1980, in Boston for the purchase of a guaranteed return contract as authored by John Hancock.

Exhibit "D" to Joint Statement (emphasis added). This letter to Hancock was written and mailed prior to anyone at Southern Bell ever having seen or reviewed a copy of the GIC. Joint Statement, ¶ 41.

The specimen contract from Hancock[12] was requested by Dean on April 11, 1980, and was received by Southern Bell at approximately noon on April 15. It was reviewed independently by Dean and his counsel on April 15. *Id.*, ¶ 42.

On the morning of April 16, Hancock officers held a meeting in order to evaluate the commitments which had been made by Hancock and prospective purchasers of GIC's in connection with the $200 million offering. This meeting was chaired by Robert K. Trapp, Senior Vice President, Group Pension Operations. Interest rates had begun to fall late on April 14, and these Hancock officers met to determine the status of outstanding negotiations pursuant to the $200 million offering as well as to determine whether the $200 million quota had been met. Since interest rates had begun to drop, the decision was made not to sell any more GIC's at the 15.5% interest rate than Hancock was already obligated to accept by virtue of transactions which had been consummated since April 11. *Id.*, ¶ 44.

At this meeting on April 16, Trapp reviewed the letter signed and mailed by Dean on April 14 and made the determination that Southern Bell had failed to meet the conditions set forth by Hancock as prerequisites for the purchase of the GIC. *Id.*, ¶ 45. Among the stated reasons for Trapp's decision was the fact that Dean's letter contained conditional language which, in Trapp's opinion, did not commit Southern Bell to purchase. Trapp reasoned that at the time the April 14 letter was written, Southern Bell had never seen a copy of the Hancock contract, and no monies had been deposited by Southern Bell with Hancock as of the meeting on April 16. *Id.*, ¶ 46.

Dean placed a telephone call to McAvoy on the morning of April 16, 1980, for the purpose of informing McAvoy that the standard form of GIC contract had been reviewed by Southern Bell, and discussing with him the form of document which Southern Bell and Hancock would sign incident to the deposit by Southern Bell of $20 million on Friday, April 18. McAvoy was not present when that call was first made. But he later called Dean on April 16, at which time he told Dean that Hancock had withdrawn the offer and that the offering was oversubscribed.[13] *Id.*, ¶ 47.

---

**11.** On April 11, Dean advised McAvoy's secretary that Southern Bell desired to invest $20 million rather than $15 million in the GIC to be issued by Hancock. McAvoy was informed of this request on Monday, April 14.

**12.** Such a specimen contract was assembled by Ruby Harris, an underwriter of Hancock, as a routine or mechanical act, since the contract is a standard form. Joint Statement, ¶ 43.

**13.** McAvoy gave that message to Dean because he was told to do so by Troy, who on April 16, sent to McAvoy through James J. Sullivan the following message: "Iain—you have to call So. Bell immediately & tell them the deal is off. Money It is no longer available, sold out." McAvoy was notified of Trapp's decision and directed to advise Dean which he did at approximately noon on April 16. *Id.*, ¶¶ 48, 49.

On April 16, 1980, Dean wrote a letter to Troy demanding that Hancock proceed with the "preparation of the necessary documents so that we may consummate this transaction on April 18, 1980." Dean did not define what the necessary documentation was to be, nor had there been any agreement between the parties that Hancock was to prepare any documentation prior to April 18. *Id.,* ¶ 51.

On April 17, 1980, Dean wrote a letter with enclosures to McAvoy. Dean stated that Hancock's signature on the Memorandum of Deposit Agreement was necessary as far as Southern Bell was concerned in order to consummate the transaction.[14] *Id.,* ¶ 53. Along with the deposit agreement forwarded to Hancock by Dean, Dean mailed a "proposal, as revised on April 14, 1980" which was, in fact, McAvoy's letter of April 11 with changes entered thereon by Southern Bell and its attorneys, increasing the deposit from $15 million to $20 million and changing the interest rate. Signature lines for both Hancock and Southern Bell were placed on this document by Southern Bell and its attorneys. This document was never signed by anyone at Hancock. *Id.,* ¶ 55.

In these motions for summary judgment, the parties have asked this court to ascertain as a matter of law whether they have entered into a valid, viable contract for plaintiff to purchase a GIC from defendant. More specifically, in its motion for summary judgment, defendant contends that there was "never any contract between the parties" because "(1) the contract, claimed by Southern Bell, does not comply with the Statute of Frauds; (2) there was no acceptance of an offer [—t]he alleged offer made by the Hancock was withdrawn prior to a valid and binding acceptance by Southern Bell; (3) there was an absolute and abject lack of mutuality and specificity; and (4) the alleged offer by the Hancock was made by an employee

without authority to tender such an offer and was likewise purportedly accepted by an individual at Southern Bell without the requisite authority to accept." Plaintiff asks this court, on the other hand, to find that Southern Bell, through its officer Dean, properly accepted a valid offer by Hancock, extended principally through and by its officers Troy and McAvoy, for Southern Bell to purchase a GIC for $20 million at 15.3%; that the memoranda and correspondence relating to this transaction are sufficient to comply with the requirement of the Statute of Frauds that the contract be in writing; and that they contain all of the essential terms for the purchase of the GIC.

As the court noted in its order of September 9, 1981, "the seminal issue presented by the cross motions for summary judgment is whether or not the court can, as a matter of law, determine if the plaintiff had accepted defendant's offer before it was withdrawn so that the court can conclude that the parties had entered a contract, the alleged breach of which is the basis of this suit."

## II. CONTRACT LAW: THE NATURE OF AGREEMENT MAKING AND THE SCOPE OF ACCEPTANCE.

The fundamental premise of contract law is articulated in Ga.Code Ann. § 20–108: "The consent of the parties being essential to a contract, until each has assented to all the terms the contract is incomplete; until assented to, each party may withdraw his bid or proposition." This principal is displayed in *Russell v. City of Atlanta,* 103 Ga.App. 365, 119 S.E.2d 143 (1961), where the court held that unless all the terms and conditions are agreed on, and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect. In that case, plaintiffs alleged that defendant, acting within the scope of his authority as manager of the City Auditori-

---

**14.** Southern Bell would not have deposited the money without Hancock's signature on the Memorandum of Deposit Agreement. Furthermore, prior to his letter of April 17 to McAvoy, Dean had never discussed Southern Bell's re-

quirement of obtaining a signed deposit agreement with Hancock and no one at Hancock had ever told him that Hancock would sign such a document. *Id.,* ¶¶ 53, 54.

um, rented to plaintiffs a portion of the auditorium for their use in conducting an antique show. Plaintiffs tendered to defendant $400 as rent, which was refused pending procurement of a license by the plaintiffs. Subsequently, the defendant wrote to the plaintiffs confirming the dates and stated that a contract would be forwarded. Several months later, however, the plaintiffs who at that time had spent considerable sums for promotion and advertising were advised by the defendant that their "tentative booking" had been cancelled. The court, in concluding that the refusal by the defendant manager to accept the tender was tantamount to his saying "wait until we are ready to enter into a contract," stated the *ratio decidendi* as follows: "If there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement, *even though the negotiations evidenced a complete willingness, or even an announced determination,* to agree in the future upon such issues as might subsequently arise, it must still follow that a valid and binding contract was not made as of the earlier date." *Id.,* at 367, 119 S.E.2d 143 (emphasis added). Likewise, in *Dumas v. First Federal Savings & Loan Association,* 654 F.2d 359 (5th Cir.1981), the court, while interpreting Georgia law, stated "[a] binding contract must be predicated upon a meeting of the minds. If terms and conditions are left to future negotiations, the requisite meeting of the minds is absent and no contract is formed." *Id.,* at 360 (citations omitted). In *Dumas,* plaintiff purchaser responded to advertisements by defendant bank after a foreclosure, and negotiations ensured between the plaintiff and the bank officials. Subsequently, the plaintiff presented a letter to the bank which was to act "as the basic agreement, subject to a mutually acceptable Purchase and Sale Agreement." Both parties initialed the letter and the plaintiff tendered initial earnest money. In return, the bank agreed to withdraw the subject property from the market until the proposal could be

further developed. The plaintiff eventually submitted a draft of the purchase and sale agreement called for in the letter but the bank considered it unacceptable. Significantly, the court conceptually characterized the letter agreement as follows:

> The letter agreement initialed by appellant and representatives of the bank was made expressly contingent upon a "mutually acceptable" purchase and sale agreement. Clearly, "mutually acceptable" connotes that the terms of the agreement are still subject to negotiations and not final. Any other reading would obfuscate the plain meaning of the language. Thus, the letter agreement can only be characterized as "an agreement to seek to agree in the future" and not a final contract.

*Id.,* at 360–61. *Russell* and *Dumas* are distinguishable from *F. & W. Grand Five-Ten-Twenty-Five Cent Stores, Inc. v. Eiseman,* 160 Ga. 321, 327, 127 S.E. 872 (1925), relied on by Southern Bell. In *Eiseman,* there was a firm acceptance of all the terms and conditions of the lease. The matter was merely referred to counsel for the preparation of a formal document embodying terms expressed in the memoranda of the parties. *Brack v. Brownlee,* 246 Ga. 818, 273 S.E.2d 390 (1980), also relied on by plaintiff, is distinguishable. In that case, there was complete agreement on all terms which were within the control of the parties. *Compare Eiseman and Brack with Clayton McLendon, Inc. v. McCarthy,* 125 Ga.App. 76, 186 S.E.2d 452 (1971) (contract lacking in mutuality, since the condition which made the contract contingent was at the pleasure of the party seeking the condition).

With respect to acceptance "subject to approval" by a third party, Professor Corbin states: "The meaning usually attributed to such words as 'subject to' is that a promise that is so limited is a conditional promise, one that is different from that for which the offeror bargained." 1 A. Corbin, Corbin on Contracts § 60, at 250 (1963).[15]

**15.** Professor Corbin illustrates this proposition

in at least two ways: (1) "There is no contract if

Moreover, he stated that an "expression that purports to be an acceptance, but is so expressed as to be operative as an acceptance only on a condition that is not so specified in the offer, is not an acceptance at all." 1 A. Corbin, *supra,* § 82, at 349–51.

Georgia law, however, has embraced the concept of "an acceptance in escrow." 6 Encyclopedia of Georgia Law, *Contracts,* § 25, at 78–79 (1978). In *Peerless Casualty Co. v. Housing Authority,* 228 F.2d 376 (5th Cir.1955), the Fifth Circuit stated the following in regards to the Georgia posture on an acceptance which is not unqualified:

> It is an elementary rule of the common law of contracts that an offer may be withdrawn at any time before it is accepted. Unless the acceptance is unconditional and without variance from the offer it is of no legal effect as an acceptance and operates as a rejection and counteroffer.... As pointed out by Professor Williston:
>
> > "A nice distinction may be taken here between (1) a so-called acceptance by which the acceptor agrees to become immediately bound on a condition not named in the offer, and (2) an acceptance which adopts unequivocally the terms of the offer but states that it will not be effective until a certain contingency happens or fails to happen. In the first case there is a counter-offer and rejection of the original offer; in the second case there is no counter-offer, since there is no assent to enter into an immediate bargain. There is, so to speak an acceptance in escrow, which is not to take effect until the future. In the meantime, of course, neither party is bound and either party may withdraw."

*Id.* at 379. *See Stone Mountain Properties, Ltd. v. Helmer,* 139 Ga.App. 865, 229 S.E.2d 779 (1976) (once the party who conditioned a contingency upon a contract fulfilled the condition, a binding contract could come into existence as long as the satisfying of the contingency occurs before the promise is withdrawn). *See also Markan Development Co. v. Rolyat, Inc.,* 93 Ga.App. 560, 92 S.E.2d 214 (1956) (notice of fulfillment of a condition as relevant).

## III. THE APPLICATION OF THE LAW TO THE FACTS.

■ In view of Georgia contract law's being predicated upon the traditional concepts of mutuality and unconditional acceptance, three factors predominate in the instant case. First, notwithstanding Hancock's not having a standard or recommended form for an acceptance letter, Hancock had reasonable expectations regarding the nature of an acceptance of a GIC offer. These expectations were manifested in the dealings between McAvoy and Dean on April 11, where McAvoy advised Dean that, as a ground rule, Southern Bell must provide Hancock with a writing to the effect that Southern Bell was *definitely* going ahead with the GIC purchase.

Second, the facts suggest that prior to Hancock's withdrawal of its offer on April 16, Southern Bell did not demonstratively assent to enter into an immediate bargain. The language "subject to the review of the contract by our legal counsel" in Dean's letter of April 14 cannot be said to encompass a context of the parties' settled expectations, especially in light of the fact that prior to the writing of this letter, no one at Southern Bell had ever seen or reviewed a copy of the GIC. Whether Hancock perceived the "subject to review" clause as tantamount to a rigorous examination or a cursory evaluation by Southern Bell's counsel of the specimen contract, future actions by Southern Bell were anticipated. This was demonstrated by Dean's letter of April 16, and his forwarding on April 17 of a "Proposal, as revised on April 14, 1980."

Finally, and most importantly, the performance of the condition in this case—the

---

an offer to sell land is accepted 'subject to' approval of title by the offeree or his attorneys;" and (2) "[a]n acceptance 'subject to a formal contract' or 'subject to a proper contract to be prepared by our solicitors' has been held in a number of cases not to be an operative acceptance." 1 A. Corbin, *supra,* at 349–51.

review by counsel—was left to the sole determination and unlimited discretion of Southern Bell. Neither Hancock nor an independent third party had anything to do by way of any performance in determining the adequacy or the acceptance of the contract. Given Southern Bell's not having seen a specimen contract by the time the April 14 letter was sent, it cannot be asserted that Southern Bell could not escape from the obligations of this understanding.

Therefore, any agreements prior to Hancock's withdrawal lacked mutuality and had no binding effect.

## IV. CONCLUSION.

This court concludes that a legally binding contract was not entered into between Southern Bell and Hancock. Accordingly, plaintiffs' motion for partial summary judgment is DENIED, and defendant's motion for summary judgment is GRANTED.